**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JUAN H.,
    *Petitioner-Appellant,*

v.

WALTER ALLEN III,
    *Respondent-Appellee.*

No. 04-15562

D.C. No.
CV-02-02018-CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted
December 8, 2004—San Francisco, California

Filed June 2, 2005

Before: Dorothy W. Nelson, Andrew J. Kleinfeld, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

## COUNSEL

Jonathan Grossman, Santa Clara, California, for the petitioner-appellant.

Bill Lockyer, Attorney General for the State of California, Robert R. Anderson, Chief Assistant Attorney General for the State of California, Gerald A. Engler, Senior Assistant Attorney General for the State of California, Gregory A. Ott, Deputy Attorney General for the State of California, Moona Nandi, Supervising Deputy Attorney General for the State of California, for the respondent-appellee.

## OPINION

GOULD, Circuit Judge:

Petitioner Juan H. appeals the United States District Court decision denying a writ of habeas corpus. He argues that his California juvenile delinquency petition for first-degree murder and attempted first-degree murder was sustained in violation of: 1) *Miranda v. Arizona*, 384 U.S. 436 (1966); 2) the Fifth Amendment prohibition on the use of involuntary or coerced statements; and 3) the Fourteenth Amendment due process right to be convicted by evidence that proves guilt beyond a reasonable doubt. The district court denied the writ. We have jurisdiction pursuant to 28 U.S.C. § 2253. We reverse the judgment of the district court and remand with instructions to grant the writ of habeas corpus.

## I

This case arises from a gang-related shooting death that occurred in Salinas, California on March 24, 1999.[1]

Some background facts before that fateful day assist our understanding. Fifteen-year-old Juan H., his brother Felix Merendon, and other members of their family lived in the same Salinas trailer park as Luis Ramirez and Sylvester Magdelano. Juan H. and his family associated with the Sureño gang, and Ramirez, Magdelano and other park residents associated with the Norteño gang. Magdelano testified that during the months before the shooting, Juan H. made gang gestures

---

[1]On habeas corpus review, the district court was required to resolve all conflicting factual inferences in favor of the prosecution, and we must view the state court evidence in the same light. *Jackson v. Virginia*, 443 U.S. 307, 326 (1979) ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").

and tried to "stare [him] down." In response, on March 10, 1999, Magdelano told Juan H. that gang signs were unwelcome, punched him in the face and knocked him to the ground. Later, Magdelano, Ramirez, and two others spoke to Merendon and Juan H.'s father about avoiding problems.

On March 24, 1999, Juan H. and his family were at home when, at approximately 9:00 pm, an unknown person or persons fired at least two shots at their trailer. The Salinas police responded to the incident, but made no arrest. About one-and-a-half hours later, Magdelano and Ramirez were walking through the trailer park and saw Juan H., Merendon and their family standing outside.[2] Juan H. and Merendon ran out of Magdelano's sight into the trailer park. Merendon reappeared from between two trailers and approached Magdelano and Ramirez. Juan H. followed his brother and stood behind him. Merendon asked Magdelano and Ramirez if they "were the ones that shot up his pad." Ramirez said that he did not know what Merendon was talking about. Merendon then pulled a shotgun from his side or the front of his pants, and shot Ramirez.[3] Ramirez died from his wounds. Magdelano fell to the ground and heard a second shot but was not hit. During the shooting, Juan H. did not say anything, make any gestures, or otherwise encourage Merendon.[4] Merendon ran to his car and drove

---

[2]Much of the factual detail about the shooting incident is derived from Magdelano's state court trial testimony.

[3]Magdelano testified that he did not see the gun until Merendon shot Ramirez, but that Merendon had the gun at his side, and that Juan H. could have seen it from where he was standing. Salinas Police Department Detective Joseph Gunter testified that he and Detective Gerry Davis interviewed Magdelano at the time of the shooting and that Magdelano then told the officers that Merendon took the gun from down the front of his pants. Davis testified regarding the same interview that Magdelano said that Merendon took the gun from his side.

[4]Magdelano's testimony, which was the only evidence on this point, was as follows:

   Q:  Juan didn't say anything, did he?

away in flight. Juan H. ran home to his family's trailer. The shooting incident lasted only about two seconds, but took the life of Ramirez, led to the flight of Merendon, and ultimately resulted in the conviction and incarceration of Juan H.

Ricardo Rubio testified that Merendon came to his house alone on the night of the shooting with a 36-inch long shotgun, and that Merendon said that he had shot one person and fired at another. Merendon described the incident using the first-person singular and did not mention that Juan H. was with him. In addition, Billy M., a thirteen-year-old neighbor of Juan H. and Merendon, testified that he ran outside of his trailer shortly after Ramirez was shot and saw Ramirez lying on the ground. According to Billy M.'s testimony, Juan H. was outside with his family, pointed his fingers in the fashion of a gun and said to Billy M., "You better watch it." Although Billy M. testified that he told this to his vice-principal, John Gutierrez, Gutierrez testified that Billy M. never mentioned this incident while discussing the shooting.

Police arrived shortly after the shooting of Ramirez, and saw a hostile crowd surrounding Juan H. and his family as

---

A:   No.

Q:   Didn't throw any gang signs?

A:   No.

Q:   Didn't make any gestures?

A:   No.

Q:   Didn't flash any weapons?

A:   No.

Q:   Didn't stick his hand down his pants like he had a weapon in his waistband or pockets or anything like that?

A:   No.

Q:   Just standing there a little bit behind his brother?

A:   Yeah.

they attempted to back out of their driveway in their minivan. The police intervened, detaining Juan H. and his family at their trailer. Detective Gunter interviewed Juan H. that evening, and the minor told Gunter that he was in his trailer with his family when the shooting occurred.

The next day, Gunter and Salinas Police Department Officer Jerry Jones conducted a custodial interrogation of Juan H. At the outset of this interrogation, Gunter told Juan H.:

> Okay. But, you know, since you're here and we're not at your house, there's something I have to do before we go back over what you told me last night, okay? You know, and that's the law, so I don't want to violate the law. Remember I told you I worry about things like that. Now, I want to remind you you have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer we'll appoint one to represent you. Do you understand those, Juan?

Juan H. indicated that he understood his rights. Gunter asked Juan H. questions about his previous involvement with the criminal justice system, and then Gunter said, "Now you don't mind talking to me about what you told me last night, am I right, about what happened?" Juan H. indicated that he did not mind and proceeded to answer questions about the shootings. Several minutes later, Juan H. asked, "I could get a, like, lawyer right now if I want?" Gunter replied, "Yes, if that's what you decided you wanted." Juan H. then responded that he did not want an attorney.

The interrogation continued. Gunter said:

> And then let's say I do arrest you. And if the judge looks at what I have to say. What do you think he's

going to say if I say, "Juan came in to me and he said — told me this story that wasn't the whole truth." Or if I can go to the judge and say, "Juan came in here and he told me everything that was true. He didn't pull any punches. Something bad happened to his family, and they had to take care of business." Or is the Judge going to look at this and say, "He lied. Don't like people who lie. But I like people who tell the truth, because true people we can help and work with." Don't you agree with that?

. . . .

That's not what happened, Juan. You and your brother were out there when those guys came across the street . . . . And then your brother shot the shotgun. Probably shocked you a lot because you probably didn't expect him to shoot anybody. Because you guys were out there making sure nobody came back and shot your family, and I understand that. Because I would have been out there. If it would have been my house I would have been out there waiting for them . . . . Nobody has a problem with people taking care of their family.

Jones added:

Juan, I think what Joe's trying to say is we're not looking to make more out of this than there actually is, okay? And we don't think that, you know, that you guys were out there looking for trouble. We think that you guys were out there trying to take care of your family. And if that's the way — I mean, you know, taking care of your family and looking for trouble, I mean nobody can blame you for that, okay?

. . . .

So we're not looking to make this out like it's a huge deal, because we know — we know that you guys were out there and you were looking out for your family, which is no different probably than any one of us would have done.

Gunter then told Juan H., "Everybody would do that. Most good people will do that, okay?"

Despite the officers' attempts to sway him, Juan H. continued to maintain that he was inside his trailer with his family when Merendon shot Ramirez and attempted to shoot Magdelano.[5] Juan H. then invoked his right to counsel by stating:

I want a . . . I want a . . . somebody right here . . . . Like you guys said if I need a lawyer or something or I can't afford one you guys will provide one for me or something like that . . . . Well, I want a lawyer. [I am telling you] that I need a lawyer or something . . . I need a lawyer. I need a lawyer or something.

Even after Juan H. repeatedly invoked his right to counsel, Gunter and Jones continued to interrogate him regarding the crimes and the whereabouts of Merendon. After several further minutes of interrogation, Gunter left the room, and Juan H. inquired, "Did [Gunter] go to get my lawyer for me?" Jones replied, "Well, your lawyer is not going to come here," and continued with the questioning. In accordance with *Miranda v. Arizona*, the state trial court suppressed those portions of the interrogation that followed Juan H.'s demand for counsel, and we do not consider this suppressed evidence,

---

[5]Gunter testified that Juan H. "told [him] that, yes, in fact, he had been outside of the trailer at the time of the shooting." As the California Court of Appeal recognized, "the tape provides little, if any, support for such a view." Gunter also testified that Juan H. made this admission twice, a statement clearly contradicted by the videotape.

which, in any event, would have added little or nothing to the case against Juan H. *See* 384 U.S. at 473-74.

The police failed to apprehend Merendon, and instead charged Juan H. with first-degree murder and attempted first-degree murder under a theory of aiding and abetting. More specifically, the charges against Juan H. alleged that he did "willfully, unlawfully and with malice aforethought murder, LUIS ALEJANDRO RAMIREZ" in violation of California Penal Code section 187, and did "willfully, unlawfully and with malice aforethought attempt to murder, SYLVESTER MAGDALENO [sic]" in violation of California Penal Code sections 664 and 187.

The videotaped interrogation was admitted into evidence over the objection of trial counsel that Juan H.'s statements were obtained in violation of *Miranda*. Trial counsel did not object on the basis that the statements were involuntary or coerced in violation of the Fifth Amendment.

Juan H. filed a motion in state court to dismiss the charges on the ground that there was insufficient evidence to sustain the delinquency petition. The motion was denied, and on May 21, 1999, the Monterey Juvenile Court found Juan H. culpable of the first-degree murder of Luis Ramirez and the attempted first-degree murder of Sylvester Magdelano. Juan H. was committed to the California Youth Authority for a sentence of 34 years and 8 months to life in prison.[6]

Juan H. appealed his conviction to the California Court of Appeal. The Court of Appeal affirmed in a reasoned opinion holding that evidence of motive, conduct, common flight and false alibi supported the delinquency petition. The California

---

[6]In California, juvenile offenders who remain in custody into adulthood are physically transferred into the California Department of Corrections system at age 21, Cal. Welf. & Inst. Code § 1802, and legally transferred at age 25, *id.* at § 1769(b).

Supreme Court affirmed without opinion. Juan H. then filed a petition for a state writ of habeas corpus, and the California Supreme Court denied the writ. Having exhausted his state-court remedies, Juan H. petitioned for a federal writ of habeas corpus in the United States District Court for the Northern District of California. The district court denied the petition, and Juan H. appeals this ruling.

## II

In assessing this appeal, it is necessary to start with a recognition of the deeply significant fact that Juan H. is a state prisoner and we are a federal court. With this in mind, we turn to the demanding standards governing and restricting the permissible grounds for the grant of a federal writ of habeas corpus in a case involving a state court criminal conviction under 28 U.S.C. § 2254.[7]

[1] Habeas corpus is an "extraordinary remedy" available only to those "persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Brecht v. Abrahamson*, 507 U.S. 619, 633-34 (1993) (quoting *Fay v. Noia*, 372 U.S. 391, 440-41 (1963), *abrogated on other grounds by Coleman v. Thompson*, 501 U.S. 722 (1991)). Because Juan H. filed his habeas petition after April 24, 1996, the provisions of the Anti-Terrorism and Effective Death Penalty Act (AEDPA) govern this case and pose special burdens. *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004) (en banc). Under AEDPA, when reviewing a state criminal conviction, we may grant a writ of habeas corpus only if a state court proceeding "(1) resulted in a decision that

---

[7]We review de novo a district court decision to deny a writ of habeas corpus. *Riley v. Payne*, 352 F.3d 1313, 1317 (9th Cir. 2003). Although we normally review for clear error any factual findings of the district court, *id.*, in this case the district court made no independent factual findings, and so we review the state court findings under the deferential standards of AEDPA, discussed below.

was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

[2] Under § 2254(d)(1), a state court decision is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court cases or "if the state court confronts a set of facts that are materially indistinguishable from" a Supreme Court decision but "nevertheless arrives at a result different from" that precedent. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision is an unreasonable application of clearly established Federal law if "the state court identifies the correct governing legal principle" from a Supreme Court decision "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. In considering whether a state court has unreasonably applied Supreme Court precedent, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *see also Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (holding that it is not enough that a federal habeas court is left with a "firm conviction" that a state court violated the Constitution and that the state court determination must also be objectively unreasonable); *Bell v. Cone*, 535 U.S. 685, 694 (2002). In conducting habeas review, we "presum[e] that state courts know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).[8]

---

[8]Aside from determining whether a state court has unreasonably applied a provision of federal law or the Constitution, under § 2254(d)(2), a federal court may also grant a writ of habeas corpus if a material factual finding of the state court reflects "an unreasonable determination of the facts

We apply these principles to the habeas claims Juan H. brings before our court.

## III

Juan H. first argues that his conviction resulted from the admission of a confession obtained in violation of *Miranda v. Arizona*, 384 U.S. 436.

In *Miranda*, the Supreme Court established the widely recognized rule that, during a custodial interrogation, an accused:

> . . . must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 478-79. The requirements of *Miranda*, as much or more than any other rule of constitutional criminal procedure, are "clearly established" federal law within the meaning of AEDPA. 28 U.S.C. § 2254(d); *Dickerson v. United States*, 530 U.S. 428, 443 (2000) ("*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture.").

[3] Although an accused must affirmatively waive the *Miranda* rights before custodial interrogation by law enforcement officers, *Miranda*, 384 U.S. at 474-75, such a waiver need not be express so long as the totality of the circumstances indicates that the waiver was knowing and voluntary,

---

in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In making this inquiry, we must presume that any state court factual finding is correct, and the petitioner has the burden of proving otherwise by clear and convincing evidence. *Id.* at § 2254(e)(1); *Wiggins v. Smith*, 539 U.S. 510, 528 (2003).

*North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case."). The totality-of-the-circumstances test applies to the interrogation of juveniles and "includes evaluation of the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

The California Court of Appeal cited to and discussed *Miranda* and *Butler* in its last reasoned decision and correctly identified the legal principles clearly established by these precedents. We therefore ask whether the state court unreasonably applied these principles to the facts of this case. *Williams*, 529 U.S. at 413.[9]

[4] Here, because we have a videotape of the challenged interrogation, there is no mystery about any communications that related to *Miranda*'s requirements. The videotape of the custodial interrogation Gunter and Jones conducted with Juan H. reflects that the minor was explicitly informed of his *Miranda* rights, and apparently understood and waived these rights at the outset of the interrogation, although he later invoked his right to counsel. Before beginning questioning, Gunter told Juan H.:

> Okay. But, you know, since you're here and we're not at your house, there's something I have to do

---

[9]Even if we were to conclude that the videotape was admitted in violation of *Miranda*, a writ of habeas corpus would be warranted only if the error "had substantial and injurious effect or influence in determining the . . . verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *Penry v. Johnson*, 532 U.S. 782, 795 (2001). We have no occasion to undertake a harmless-error inquiry here because we conclude below that the state court was not objectively unreasonable in determining that there was no *Miranda* violation.

before we go back over what you told me last night, okay? You know, and that's the law, so I don't want to violate the law. Remember I told you I worry about things like that. Now, I want to remind you you have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer we'll appoint one to represent you. Do you understand those, Juan?

This statement in its material elements closely tracks the language of *Miranda*. *Cf.* 384 U.S. at 478-79. Juan H. nevertheless challenges the opening sentences: "But, you know, since you're here and we're not at your house, there's something I have to do before we go back over what you told me last night, okay? You know, and that's the law, so I don't want to violate the law." Juan H. contends that these sentences downplayed the import of the *Miranda* warnings, and thus vitiated their efficacy. We disagree. This language did not convey that the *Miranda* warnings were unimportant. On the contrary, it indicated that the warnings had serious legal meaning and that the policeman acknowledged that the setting was custodial. Also, subsequent events during the interrogation support a conclusion that Juan H. understood the importance of his *Miranda* rights. When Juan H. finally invoked his right to counsel, he referred back to the warnings, stating, "Like you guys said if I need a lawyer or something or I can't afford one you guys will provide one for me or something like that . . . Well, I want a lawyer." This subsequent demand for counsel by Juan H. and the completeness of the warnings given by Gunter demonstrate that Juan H. was informed of and understood the content and importance of his *Miranda* rights.

**[5]** Juan H. also effectively waived his *Miranda* rights. Shortly after giving Juan H. the *Miranda* warnings, Gunter asked him, "Now you don't mind talking to me about what you told me last night, am I right, about what happened?"

Juan H. indicated that he was willing to talk and proceeded to answer questions about the events of March 24, 1999. In addition, Juan H. later inquired, "I could get a, like, lawyer right now if I want?" When Gunter replied, "Yes, if that's what you decided you wanted," Juan H. again indicated that he did not want the assistance of counsel. The state court was not unreasonable in holding that Juan H.'s responses constituted a valid waiver of his *Miranda* rights. *See Butler*, 441 U.S. at 373.

In summary, the totality of the circumstances shown in the state court record indicates that the state court was not objectively unreasonable in concluding that Juan H. was apprised of his *Miranda* rights, that he actually understood those rights, and that he validly waived them for the portions of the interrogation admitted into evidence. *See Fare*, 442 U.S. at 725-26.[10]

## IV

Juan H. next contends that his conviction was obtained through the use of coerced or involuntary statements in violation of the Fifth Amendment. Because his trial attorney did not object to the admission of the statements on the basis of voluntariness, Juan H. frames his coercion claim by arguing that failure to raise this objection constituted ineffective assistance of counsel within the meaning of the Sixth Amendment and *Strickland v. Washington*, 466 U.S. 668 (1984).

"An ineffective assistance claim has two components: A

---

[10]Juan H. further contends that the state court erred in treating the question of waiver as a factual, rather than a legal, question in violation of *Miller v. Fenton*, 474 U.S. 104, 112 (1985). The holding of *Miller* — a case governing the standards federal courts should use in adjudicating claims of coerced or involuntary confessions when sitting in habeas — is inapplicable here. Federal courts are not in the business of mandating how state courts decide the cases on their dockets, so long as the results are not unreasonable and the methods employed conform to the broad requirements of due process. *See Patterson v. New York*, 432 U.S. 197, 201-02 (1977).

petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins*, 539 U.S. at 521. In evaluating whether the performance of counsel was deficient in a constitutional sense the relevant question is whether "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. In considering prejudice, the appropriate inquiry is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The California Court of Appeal cited to *Strickland* and its holding in rejecting Juan H.'s ineffective assistance of counsel claim. We therefore consider whether the state court unreasonably applied the principles of *Strickland*. *Williams*, 529 U.S. at 413.

[6] Here, the merits of the coercion claim control the resolution of the *Strickland* claim because trial counsel cannot have been ineffective for failing to raise a meritless objection. Under the Fifth Amendment, a confession is coerced or involuntary if "the defendant's will was overborne at the time he confessed." *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963). A totality-of-the-circumstances test applies in determining whether the will of an accused was "overborne." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Coercion can be mental or physical, but to render a statement involuntary, coercion must exist to such a degree that the statement is not "the product of an essentially free and unconstrained choice by its maker." *Schneckloth*, 412 U.S. at 225 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)); *see also Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). It is not enough, even in the case of a juvenile, that the police "indicate that a cooperative attitude would be to [the] benefit" of an accused unless such remarks rise to the level of being "threatening or coercive." *Fare*, 442 U.S. at 727.

[7] We have carefully reviewed the videotape of Gunter and Davis interrogating Juan H. Notwithstanding Gunter's testimony to the contrary, we agree with the California Court

of Appeal that Juan H. never "confessed" in any common sense of the word. Although Jones and Gunter misrepresented the serious potential legal consequences Juan H. would face were he to admit involvement in Merendon's crimes, Juan H. stood his ground. The minor remained in control of his responses during the interrogation, and the videotape contains nothing that would indicate that his will was "overborne." *See Lynumn*, 372 U.S. at 534. Perhaps more importantly, even if Juan H. had confessed after police trickery, the interrogators did not use coercive means sufficient to render Juan H.'s statements involuntary. *See Fare*, 442 U.S. at 727. Any objection to the admission of the videotape on the basis of coercion would properly have been overruled. The California Court of Appeal was not objectively unreasonable in holding that the performance of counsel did not fall below an "objective standard of reasonableness" on account of not raising this meritless objection. *See Strickland*, 466 U.S. at 688.[11]

## V

Juan H. finally argues that the state court decision sustaining his juvenile delinquency petition violated his Fourteenth Amendment due process right to be convicted by evidence that proves his guilt beyond a reasonable doubt.

[8] As a matter of federal constitutional law, "the Due Pro-

---

[11]Although we have no occasion to consider prejudice, we note the fundamental error in the state's argument that the videotape was "exculpatory" because it "discredited" Gunter's false testimony, introduced by the prosecution as part of its case-in-chief, that Juan H. twice admitted being outside with Merendon. If the prosecution has secured a conviction through use of a truly involuntary or coerced statement, the state may not render this error "harmless" or demonstrate lack of prejudice by introducing false evidence at trial and later maintaining that the accused's involuntary statements "discredited" this offer of proof. *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991); *Miranda*, 384 U.S. at 476-77; *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The state's suggestion to the contrary is devoid of merit.

cess Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *see also Herrera v. Collins*, 506 U.S. 390, 402 (1993) (noting that "a conviction based on evidence that fails to meet the *Winship* standard" is an "independent constitutional violation"). A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds. In *Jackson v. Virginia*, the Supreme Court held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319.

## A

After AEDPA, we apply the standards of *Jackson* with an additional layer of deference. 28 U.S.C. § 2254(d). In this case, the California Court of Appeal neither applied a standard fundamentally at odds with Supreme Court precedent nor reached a different result on materially indistinguishable facts.[12]

---

[12]In its last reasoned decision, the California Court of Appeal used the following standard in reviewing the claim based upon sufficiency of the evidence:

> In reviewing the denial of a motion to dismiss, we apply the substantial evidence test, under which we view the record in the light most favorable to the court's order and presume in support thereof the existence of every fact that may reasonably be deduced from the evidence. (*In re Man J.* (1983) 149 Cal.App.3d 475, 482; see *People v. Johnson* (1980) 26 Cal.3d 557, 576.) "Accordingly, we may not set aside the trial court's denial of the motion on the ground of the insufficiency of the evidence unless it clearly appears that upon no hypothesis whatsoever is there sufficient substantial evidence to support the conclusion reached by the court below." (*People v. Wong* (1973) 35 Cal.App.3d 812, 828.)

Thus, we agree with our sister circuits who have addressed the issue that we must ask whether the decision of the California Court of Appeal reflected an "unreasonable application of" *Jackson* and *Winship* to the facts of this case. *See* 28 U.S.C. § 2254(d)(1); *Torres v. Mullin*, 317 F.3d 1145, 1163 (10th Cir. 2003) (Henry, J., concurring in part and dissenting in part); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002); *Sanford v. Yukins*, 288 F.3d 855, 863 (6th Cir. 2002); *Piaskowski v. Bett*, 256 F.3d 687, 691 (7th Cir. 2001); *Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir. 2001).[13]

**B**

In conducting our inquiry, we are mindful of "the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296-97 (1992) (plurality opinion); *cf. Yarborough v. Alvarado*, 124 S. Ct. 2140, 2149 (2004); *Herrera*, 506 U.S. at 400; *Engle v. Isaac*, 456 U.S. 107, 128 (1982) ("The States possess primary authority for defining and enforcing the criminal law."). Our deference, however, is not without limit. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.").

---

Although the California Court of Appeal decision does not cite to the relevant federal case law in reaching its decision regarding sufficiency of the evidence, such a citation is not required "so long as neither the reasoning nor the result of the state-court decision contradicts" Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2003) (per curiam). Accordingly, the question for us remains whether the state court in substance made an objectively unreasonable application of the *Winship* and *Jackson* standards for sufficiency of the evidence.

[13]We note that this Circuit has not yet decided what standard applies to sufficiency of the evidence challenges under AEDPA. *See Chein*, 373 F.3d at 983; *Bruce v. Terhune*, 376 F.3d 950, 956-57 (9th Cir. 2004) (per curiam). We conclude that the Supreme Court's analysis of AEDPA in *Williams* compels the conclusion that the state court's application of the *Jackson* standard must be "objectively unreasonable." 529 U.S. at 409.

In recent years, the Supreme Court has held that a writ of habeas corpus based upon a claim of insufficient evidence was warranted when the state had presented no evidence that a defendant lacked a permit to operate a hazardous waste facility, a material element of the criminal offense. *Fiore v. White*, 531 U.S. 225, 226-29 (2001) (per curiam). In our Circuit, we have held that a writ of habeas corpus should have been granted to a petitioner who demonstrated that no reasonable jury could have found that false statements given under oath were material to an underlying court case, an element essential to sustaining his conviction for perjury. *Chein*, 373 F.3d at 993. More closely akin to the instant case, in *Piaskowski v. Bett*, the Seventh Circuit affirmed the grant of a writ of habeas corpus to a petitioner who had been convicted of first-degree murder under a conspiracy theory based upon evidence of alleged motive, statements implying knowledge of the murder, and the testimony of two witnesses that, if taken as true, placed the petitioner at the scene of both the murder and an earlier assault of the victim. 256 F.3d at 691-93. Although circuit decisions may be pertinent to the extent that they illuminate the meaning and application of Supreme Court precedents, *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004), only "clearly established Federal law, as determined by the Supreme Court of the United States" can be the basis for relief under AEDPA, 28 U.S.C. § 2254(d). *Campbell v. Rice*, No. 99-17311, slip op. 5443, 5450 (9th Cir. May 20, 2005) (en banc).

**[9]** Although our sufficiency of the evidence review is grounded in the Fourteenth Amendment, we undertake the inquiry with reference to the elements of the criminal offense as set forth by state law. *Jackson*, 443 U.S. at 324 n.16. Juan H. was found culpable of the first-degree murder of Luis Ramirez and the attempted first-degree murder of Sylvester Magdelano, in violation of California Penal Code sections 664 and 187, under a theory of aiding and abetting. Both parties agree that under California law "a person aids and abets the commission of a crime when he or she, acting with (1)

knowledge of the unlawful purpose of the perpetrator, and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." *People v. Beeman*, 674 P.2d 1318, 1326 (Cal. 1984).

**[10]** An aider and abettor must share in the principal's criminal purpose or intent. *Id.* at 1323-27; *see also People v. Campbell*, 30 Cal. Rptr. 2d 525, 529 (Cal. Ct. App. 1994) ("[I]n general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission."). The prosecution must establish intent with respect to the specific offense the defendant is alleged to have aided and abetted; intent may not be established based upon "the . . . generalized belief that the defendant intended to assist and/or encourage unspecified 'nefarious conduct.' " *People v. Prettyman*, 926 P.2d 1013, 1024-25 (Cal. 1996); *see also People v. Hickles*, 66 Cal. Rptr. 2d 86, 93-94 (Cal. Ct. App. 1997) (stating that aiding and abetting liability for murder does not attach when a defendant knew only of an assault without a deadly weapon or knew only of a planned argument, but not a planned assault).

Comparing these elements to the evidence in this case, viewed in the light most favorable to the prosecution, and all reasonable inferences that may be drawn from this evidence, we conclude that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. To survive a due process challenge here, the record of conviction must reflect sufficient evidence to allow any reasonable factfinder to conclude that Juan H.: 1) knew that Merendon planned to commit, with malice aforethought, the willful, deliberate, and premeditated murders of Ramirez and Magdelano, *see* Cal. Penal Code §§ 187, 189; 2) specifically intended to encourage or facilitate Merendon's unlawful conduct; and 3) affirmatively acted in a manner so as to aid, promote, encourage or instigate the murders. *See Beeman*, 674 P.2d at 1326; *see also Patterson*,

432 U.S. at 215 ("[A] State must prove every ingredient of an offense beyond a reasonable doubt . . .").

In affirming the conviction of Juan H., the California Court of Appeal discussed evidence of motive, conduct, flight and false alibi. With respect to motive, the California Court of Appeal noted that Juan H. had made gang gestures towards Magdelano months before the shooting and that Magdelano had punched Juan H. on one prior occasion. The court further determined that "Felix and the minor suspected Magdelano and Luis of shooting into their trailer." Turning to the offense conduct, the California Court of Appeal interpreted the record to reflect that:

> [T]he minor and Felix were together outside the trailer, and, upon seeing Magdelano and Luis, they both ran to a hiding place, where Felix retrieved a 36-inch shotgun. As Magdelano and Luis approached, the minor and Felix emerged together from hiding and confronted them. The minor stood somewhat behind Felix, in a position to see and provide back-up support. Felix did the talking and accused Magdelano and Luis of shooting at their trailer. Immediately after Luis responded, Felix shot him. Magdelano ran but fell and then heard a second shot.

Finally, the California Court of Appeal determined that Juan H. manifested consciousness of guilt because "[h]e and Felix fled together toward their trailer, and a short time later police intercepted the minor trying to leave the area with his family" and "when questioned by the police, the minor gave a false alibi: He was in the trailer and not present during the shooting." The California Court of Appeal concluded that, "the evidence of motive and consciousness of guilt is insufficient standing alone to prove the minor's culpability. However, when this evidence is considered together with his conduct

and evidence of flight, we find ample basis to support a finding of culpability beyond a reasonable doubt."

**[11]** The California Court of Appeal decision affirming the conviction of Juan H. was an unreasonable application of the Fourteenth Amendment requirement that the prosecution present evidence sufficient to prove every element of a crime beyond a reasonable doubt. *See* 28 U.S.C. § 2254(d)(1); *In re Winship*, 397 U.S. at 365-68; *Jackson*, 443 U.S. at 319. The record contains manifestly insufficient evidence to support the necessary conclusions that Juan H. knew that Merendon planned to commit the first-degree murders of Ramirez and Magdelano, and that Juan H. acted in a way intended to encourage or facilitate these killings. Viewed in a light most favorable to the prosecution, the circumstantial evidence in this case does not permit any reasonable factfinder to sustain the delinquency petition of Juan H. on the charges of aiding and abetting first-degree murder and attempted first-degree murder, as those crimes are defined by California law.

**[12]** As an initial matter, the trial record does not support a conclusion that Juan H. left the murder scene in common "flight" with Merendon. The undisputed evidence shows that Merendon ran to his car and drove to the home of Rubio, while Juan H. ran home to his family's trailer and was located there when the police arrived. No reasonable trier of fact could find evidence of criminal culpability in the decision of a teenager to run home from the scene of a shooting, regardless of whether the home was in the same general direction as the car of a fleeing suspect. Likewise, any rational factfinder would find little or no evidence of guilt in the fact that Juan H. attempted, along with the rest of his family, to leave his home as it was being surrounded by an angry mob of neighbors.

**[13]** With respect to the evidence of the false alibi, the determination of the California Court of Appeal that the untrue statements Juan H. made to the police reflected con-

sciousness of guilt is bare conjecture. Juan H. might have made a false statement to law enforcement for any number of reasons, especially given that any statements he made as a witness would likely be used to prosecute his older brother, a member of his immediate family. Although we must draw all reasonable inferences in favor of the prosecution, a "reasonable" inference is one that is supported by a chain of logic, rather than, as in this case, mere speculation dressed up in the guise of evidence.

**[14]** With respect to motive, the record contains very little evidence that would allow a reasonable factfinder to infer that "the minor suspected Magdelano and Luis of shooting into their trailer." Although there was ample evidence that Merendon held this opinion, the prosecution was required to prove its case with respect to Juan H., and the determination that Juan H. believed that Magdelano and Ramirez had shot at his house was, again, unsupported speculation. The primary evidence of motive was that Juan H. made gang gestures at Magdelano during the months before the shootings and that Magdelano had once punched Juan H. in the head and knocked him to the ground. Although these events provide evidence that there may have been interpersonal tensions between Magdelano and Juan H., they do not create a sufficiently strong inference of motive to allow a reasonable trier of fact to conclude beyond a reasonable doubt that Juan H. had reason to aid and abet first-degree murder.

**[15]** Finally, with respect to the alleged offense conduct, the record reflects no direct evidence that Juan H. had any idea that Merendon planned to assault or murder Magdelano and Ramirez. Further, the circumstantial evidence presented does no more than establish that a rational trier of fact could conclude that Juan H. knew his brother was armed and ready to confront Magdelano and Ramirez if the family and home of Juan H. were again threatened. That Juan H. stood behind his older brother after the family home had been attacked, even if he knew his brother was armed, does not permit the

rational inference that he knew his brother would, without provocation, assault or murder the victims.[14]

It is not enough for the prosecution to demonstrate that Juan H. knew that some criminal activity was afoot on the night of March 24, 1999 or that Merendon planned to confront Ramirez and Magdelano while holding a firearm. Rather, the element of knowledge must be proven with respect to first-degree murder and attempted first-degree murder, the specific crimes Juan H. was alleged to have aided and abetted. *See Beeman*, 674 P.2d at 1326. Even if we were to assume the element of knowledge, the record does not reflect

---

[14]Both parties cite numerous California cases for us and argue that their facts and holdings govern the disposition of this habeas petition. *See, e.g.*, *People v. Laster*, 61 Cal. Rptr. 2d 680 (Cal. Ct. App. 1997) (holding that the jury could conclude that defendant aided and abetted murder if it had concluded that defendant aided and abetted in the target offense of discharging a firearm from a motor vehicle because defendant could have foreseen murder under the circumstances); *Campbell*, 30 Cal. Rptr. 2d 525 (holding that presence at scene of crime when defendant knew of victims' isolation, concerted action that continued during the robbery, and post-offense conduct in furtherance of the crime was sufficient evidence); *People v. Chagolla*, 193 Cal. Rptr. 711 (Cal. Ct. App. 1983) (holding that there was sufficient evidence that defendant who rode with principal, shouted gang slogans at victims and fled with principal aided and abetted murder); *People v. Moore*, 260 P.2d 1011, 1013-14 (Cal. Ct. App. 1953) (holding that a person who "was in the position of a lookout[,] . . . was in the company of the other defendants before the crime was committed, remained with them during the robbery, fled with them from the [crime scene], and when arrested in company with the others had the knife and stolen bills in his possession" aided and abetted the crime). These questions of California law, however, have been fully litigated on direct and habeas review in the California courts and are not properly subject to federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Stanton v. Benzler*, 146 F.3d 726, 728 (9th Cir. 1998). We look to California law only to establish the elements of aiding and abetting and then turn to the federal question of whether the California Court of Appeal was objectively unreasonable in concluding that sufficient evidence supported the delinquency petition. *Jackson*, 443 U.S. at 324 n.16.

any evidence that Juan H. intended, through his actions, to assist Merendon in committing first-degree murder. Juan H. did not do or say anything before, during or after the shootings from which a reasonable factfinder could infer an intent or purpose to aid and abet in the murder of Ramirez and the attempted murder of Magdelano. Nor could any factfinder reasonably conclude that, by standing, unarmed, behind his brother, Juan H. provided "backup," in the sense of adding deadly force or protecting his brother in a deadly exchange.

[16] Speculation and conjecture cannot take the place of reasonable inferences and evidence — whether direct or circumstantial — that Juan H. — through both guilty mind and guilty act — acted in consort with Merendon. In this case, after resolving all conflicting factual inferences in favor of the prosecution, *see Jackson*, 443 U.S. at 326, it is only speculation that supports a conclusion that Juan H. knew that Merendon planned to commit the first-degree murders of Ramirez and Magdelano, and that Juan H. took some action intended to encourage or facilitate Merendon in completing the killings.[15]

---

[15]In addition, under the California Penal Code, "[t]he liability of an aider and abettor extends also to the natural and reasonable consequences of the acts he knowingly and intentionally aids and encourages." *Beeman*, 674 P.2d at 1326. To obtain a conviction under this theory, the jury must find the elements of aiding and abetting with respect to the target crime and "must also find that (4) the defendant's confederate committed an offense *other than* the target crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." *Prettyman*, 926 P.2d at 1020. The state argues that Juan H. is liable for the natural and probable consequences of an assault with a deadly weapon on Ramirez and an attempted assault with a deadly weapon on Magdelano. We reject this argument. The reasons for finding insufficient evidence to support a conviction for aiding and abetting first-degree homicide are equally applicable to assault with a deadly weapon, as that crime is defined under California Penal Code section 245. *Cf. Windham v. Merkle*, 163 F.3d 1092, 1101-02 (9th Cir. 1998). The state does not argue that Juan H. is liable for first-degree murder because he aided and abetted the misdemeanor offense of drawing, exhibiting, or using a firearm or deadly weapon under California Penal Code section 417. We accordingly do not consider this claim and any constitutional problems that it may present.

Such a lack of evidence violates the Fourteenth Amendment guarantee that an accused must go free unless and until the prosecution presents evidence that proves guilt beyond a reasonable doubt. *See In re Winship*, 397 U.S. at 365-68.[16]

**REVERSED AND REMANDED WITH INSTRUCTIONS TO GRANT A WRIT OF HABEAS CORPUS.**

---

[16]For all that is shown in the record, it appears that Merendon may not have been brought to justice for the shooting death of Ramirez. But, if so, the failure of law enforcement to apprehend a principal does not license the state to impute such serious guilt to an alleged aider and abettor absent evidence that meets the constitutional requirement that every element of a crime be established beyond a reasonable doubt with respect to the accused.