Filed 10/30/13  P. v. Bravo CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAMON BRAVO,<br><br>    Defendant and Appellant. | C071350<br><br>(Super. Ct. No. 10F02227) |

Following a jury trial, defendant Ramon Bravo was convicted of attempted murder (Pen. Code, §§ 664/187, subd. (a))[1] and discharge of a firearm from a motor vehicle (former § 12034, subd. (c)),[2] with a gang enhancement (§ 186.22, subd. (b)(1)) and a personal discharge of a firearm causing great bodily injury enhancement (§ 12022.53, subds. (b)-(e)).  The trial court sentenced defendant, as an aider and abettor, to serve consecutive terms of seven years for attempted murder and 25 years to life for the firearm enhancement.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Effective January 1, 2012, former section 12034 was repealed and reenacted without substantive change as section 26100.  (See §§ 16000, 16005; Stats. 2010, ch. 711, §§ 4, 6.)  Subsequent statutory references are to the code provisions in effect at the time of the offense.

1

On appeal, defendant contends there is insufficient evidence to support his convictions for attempted murder and discharging a firearm from a motor vehicle. We conclude substantial evidence supports defendant's convictions and affirm the judgment.

### The Victim's Testimony

On the morning of April 3, 2010, Juan Alvarado, a member of the Norteño gang, started walking from his girlfriend's house on Taft Street to his father's home on Berggren Street, about five blocks away. As Alvarado turned onto Berggren Street, a car drove up, stopped, and Alvarado was shot by the man in the front passenger seat. Alvarado was hit once in the abdomen, sustaining life-threatening injuries. Defendant was the driver. The passengers were: Gerardo Villasenor, Narciso Guzman, and Roberto Padilla. The occupants of the car were members of the Sureño gang.

At trial, Alvarado testified he was walking with his head down "half asleep" when he heard a screeching sound, as if someone driving a car was slamming on the brakes. He then heard a gunshot, looked up, and saw heads in the car. Alvarado was walking north, while the car traveled south on Taft Street. The car took off after he was shot.

Alvarado initially denied knowing who shot him, but later identified Villasenor (codefendant) as the shooter.[3] Codefendant was about 25 feet from Alvarado when he was shot.[4] Alvarado attended sixth and seventh grades with codefendant, and knew codefendant's brother. As a Norteño, he was not supposed to snitch against others, even members of a rival gang like the Sureños.

A police officer responding to the incident found Alvarado in the backyard of a nearby residence. Among the items worn by Alvarado were a red belt with the letter "N" on the buckle and black and red shoes. Alvarado said he was walking outside when he

---

[3] Villasenor is not a party to this appeal.

[4] Before Alvarado admitted codefendant shot him, he testified the car was 40 feet away when he was shot.

was shot, and then jumped over a fence and told the home's resident to call the police. Alvarado identified the car as a late 1990's gold, four-door Oldsmobile. He said there were five Hispanic guys in the car, all members of the Sureño gang. Alvarado would not further identify them, which was common in gang shootings.

Alvarado was later interviewed by police at the hospital. He told the officer he was walking north on Taft Street at the corner of Berggren Street, when a car traveling south on Taft turned left on Berggren. Someone on the passenger side shot him. The car was about 12 feet away from Alvarado when he was shot. The car's occupants were from the Howe Park Sureño gang.

Alvarado identified codefendant as the shooter in a photographic lineup. Alvarado told the officer he thought he went to middle school with codefendant, and had beaten up codefendant's older brother and the boyfriend of codefendant's sister when he was in the ninth grade.

### Guzman's Testimony

In April 2010, Narciso Guzman lived with his parents in Sacramento, having moved there from Orange County about 10 years earlier. He was friends with Sureño gang members in Orange County, and joined the Sureños within a few years of moving to Sacramento. He was a friend of codefendant, whom he referred to by the nickname "Lalo," and knew defendant by the nickname "Charlie Brown." He admitted Howe Park Sureños often carried guns.

On the day of the incident, Guzman was picked up in the Arden area by defendant, who was driving an Oldsmobile Alero. Guzman sat in the rear passenger seat, while defendant drove and codefendant sat in the front passenger seat. Padilla sat behind defendant. At 7:12 a.m., they stopped at a liquor store at the intersection of Marysville Boulevard and Del Paso Boulevard, where Guzman bought beer.

After buying beer, defendant drove to the "wrong side of the neighborhood" instead of to Guzman's neighborhood to drop Guzman off at his home. Codefendant

3

spotted a person he recognized, and defendant pulled over at the intersection of Taft and Berggren Streets. The car was in the center of the street at the intersection. Guzman could not recall why defendant stopped the car, and did not remember seeing the person wearing anything red. However, he believed that after the incident, codefendant mentioned going to school with the person. Guzman believed the man was a "Northerner."

Both before and after the shooting, no one in the car spoke. Guzman was "mean mugging"[5] the man on the street, and he believed codefendant was doing the same. Codefendant stuck a gun out of the window and fired three or four shots at the man. Defendant then made a u-turn at normal speed and drove back to Del Paso Boulevard in the direction of Marysville Boulevard. They stopped at the home of "Shaggy," another gang member, where they socialized before Shaggy drove Guzman home. It took five to ten minutes to drive from the scene of the shooting to Shaggy's home.

Guzman was surprised when codefendant started shooting, and defendant looked shocked when the shots were fired. They never talked about going to look for Northerners. They only discussed getting some beer and going home. Later in his testimony, Guzman admitted he did not see whether defendant looked at the victim or had a look of shock on his face.

In an interview with police, Guzman said he was picked up at his house by defendant and codefendant on the day of the shooting. They cruised around and got some beer. Codefendant saw a Norteño and shot three to four times at him. Afterward, defendant dropped Guzman off at a store and he walked home.

### Other Evidence

Alejandro Buraga lived on Berggren Way in April 2010. He was having breakfast with his family on April 3, 2010, at around 8:00 a.m., when he heard three to four

---

[5] A term for giving somebody a dirty look.

4

popping sounds, like fireworks.  He went outside and saw a Hispanic man running fast and a speeding car.  The man ran west on Berggren Street and then south on Taft Street. The car, a white two-door, followed the man.

A Sacramento Police detective testified as an expert on Hispanic gangs.  Alvarado was a validated member of the Norteños, a gang associated with the color red.  The rival Sureños were associated with the color blue.  Shooting at a rival gang member benefits the gang by showing the gang is not afraid of the rival or to use guns.  Gang members are taught to carry a gun and to be aware of their surroundings at all times.  Snitching is disapproved, and can lead to being killed, beaten, or ostracized if kept alive.

Codefendant was a validated Howe Park Sureño with the gang name Lalo. Guzman and Padilla were validated Howe Park Sureños and defendant was a validated Sureño.

The expert found the shooting benefitted the Howe Park Sureños by demonstrating they were unafraid of the rival Norteños, were willing to use guns, and were trying to reduce the membership of a rival gang.  A crime like this would elevate the status of the shooter and the driver within the gang.

DISCUSSION

I

### *Substantial Evidence of Aiding and Abetting the Attempted Murder*

Defendant contends there is insufficient evidence to convict him of attempted murder as an aider and abettor.  We disagree.

The elements of aider and abettor liability are established upon proof a person, "acting with (1) knowledge of the unlawful purpose of the perpetrator and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."  (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

5

"To be guilty of a crime as an aider and abettor, a person must 'aid[] the [direct] perpetrator by acts or encourage[] him [or her] by words or gestures.' [Citations.] In addition, except under the natural-and-probable-consequences doctrine [citation], . . . the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of,' the crime in question. [Citations.] When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.] Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing -— which means that the person guilty of attempted murder as an aider and abettor must intend to kill. [Citation.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623-624.)

In this case, the jury was not instructed on the natural and probable consequences doctrine. Therefore, the People had to prove defendant had the intent to kill. Defendant argues there was no evidence he intended to kill Alvarado. He claims there was no evidence of a plan to kill Norteño gang members because the group intended only to make a "beer run." Defendant asserts there was no evidence the other passengers in the car knew that codefendant had a gun and had a personal motive for killing Alvarado because Alvarado had beaten up codefendant's older brother. He further claims the manner of the shooting -- defendant turning the car, slowing briefly, and then codefendant shooting -- shows defendant had no advance warning. Finally, he contends the gang evidence did not support an inference of an intent to kill.

6

"To determine sufficiency of the evidence, we must inquire whether a rational trier of fact could find defendant guilty beyond a reasonable doubt. In this process we must view the evidence in the light most favorable to the judgment and presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. To be sufficient, evidence of each of the essential elements of the crime must be substantial and we must resolve the question of sufficiency in light of the record as a whole. [Citations.]" (*People v. Johnson* (1993) 6 Cal.4th 1, 38.)

The fact that neither defendant nor codefendant expressed an intent to kill is not unusual. Intent is a state of mind, which, in the absence of the defendant's own statements (i.e., direct evidence), must be established by circumstantial evidence from which intent can be inferred. (*People v. Mincey* (1992) 2 Cal.4th 408, 433.) Because the defendant is the only person who has actual knowledge of his or her intent, the element of intent is rarely susceptible of direct proof and usually must be inferred from circumstantial evidence. (*People v. Falck* (1997) 52 Cal.App.4th 287, 299.)

Here, there is circumstantial evidence to support an inference of defendant's intent to kill. Alvarado wore a red belt and red and black shoes as he walked down the street. These red items identified him as a member of the rival Norteño gang, thus providing defendant and codefendant with a motive for killing him -- elevating their status in the Sureño gang. According to Guzman's testimony, defendant took a detour from their intended route when he drove to the area where codefendant identified and shot at Alvarado. Defendant then turned left and stopped in an intersection.[6] His car was either

---

[6] Defendant's contention that he merely slowed down rather than stopped is not supported by the record. Asked, "are you sure you stopped in the middle of the street after you made that left," Guzman replied, "Yes, ma'am." When the prosecutor asked if he was sure, Guzman said he was "[p]ositive." Guzman also testified defendant pulled the car over after codefendant saw a person he recognized, and could not recall why defendant stopped the car. Whether other parts of Guzman's and Alvarado's testimony indicate the car did not stop is irrelevant, because in reviewing the sufficiency of the

25 feet away (by Guzman's trial testimony) or 12 feet away (by Guzman's interview with the police) from Alvarado and situated so codefendant could point his gun out the passenger side window and fire three to four shots at him.

From this evidence, the jury could reasonably infer defendant had the intent to kill. By driving a different route and slowing down or stopping at the intersection, defendant provided codefendant with the opportunity to shoot several times at a rival Norteño gang member from close range. By driving away from the scene of the shooting, defendant provided an escape. (*People v. Lee* (1987) 43 Cal.3d 666, 679 [firing gun at officers 15 to 20 feet away evidence of intent to kill]; *People v. Campos* (2007) 156 Cal.App.4th 1228, 1244 [stopping truck four to five feet from a car and firing nearly a dozen bullets into it constitutes "overwhelming evidence" of intent to kill a passenger]; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224-1225 [firing six shots at the occupants of a truck from about 25 feet is substantial evidence of intent to kill].)

Defendant's reliance on *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262 is misplaced. In *Juan H.*, the juvenile court found the minor culpable of first degree murder and attempted murder, both on the theory of aiding and abetting, even though the minor had not said anything, made any gestures, or otherwise encouraged the perpetrator. (*Id.* at pp. 1266-1267, 1269.) The United States Court of Appeals for the Ninth Circuit reversed the federal district court's denial of a writ of habeas corpus because the evidentiary insufficiency violated the minor's federal due process rights. (*Id.* at pp. 1266, 1279.) The present case is distinguishable because the prosecution established more than defendant's presence in the car. As we have explained, defendant drove the car out of the way to get to the area where the victim was walking, slowed or stopped the car in the middle of the road enabling defendant to fire several shots at relatively close range, and

---

evidence, "[w]e resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

8

drove away from the scene of the shooting. We conclude defendant's conviction for attempted murder as an aider and abettor is supported by substantial evidence.

## II

### *Substantial Evidence of Aiding and Abetting the Discharge of a Firearm from a Motor Vehicle*

Defendant contends there is insufficient evidence to support his conviction as an aider and abettor for discharging a firearm from a motor vehicle.[7]

Former section 12034, subdivision (c), provided: "Any person who willfully and maliciously discharges a firearm from a motor vehicle at another person other than an occupant of a motor vehicle is guilty of a felony punishable by imprisonment in state prison for three, five, or seven years." (Stats. 1987, ch. 1147, § 3, p. 4059.) Defendant asserts there is insufficient evidence he intended to facilitate a shooting because he did not know codefendant had a firearm. In support, defendant notes Guzman testified codefendant shot suddenly and without warning, defendant looked shocked when codefendant fired the handgun, no gang signs were thrown before the shooting, and no words were uttered before the shooting.

Guzman's testimony that defendant had a look of shock on his face when codefendant fired is contradicted by his testimony that he did not see defendant's face when the gun was fired. As previously noted, we resolve this conflict in favor of the guilty verdict. While no gang signs were thrown, Alvarado wore the color associated with the rival Norteños, and Guzman told the police this led him to believe the victim was a Norteño. Although the driver and passengers in the car may not have discussed

---

[7] Defendant argues the People have waived their response to the second contention because their brief did not address this contention under a separate heading. While we agree the better approach would be to address the two contentions separately, the same evidence supports the conviction for attempted murder and discharging a firearm from a motor vehicle. Despite the lack of a separate heading or subheading for each contention, we will address the merits of both contentions.

firearms, Guzman testified it was common for Howe Park Sureños to carry firearms. Also, Guzman's professed surprise at the shooting is not relevant to whether defendant, the driver, was surprised by the shooting.

Defendant drove the car in a manner that provided codefendant with the opportunity to fire the gun at Alvarado from his window at comparatively close range. We conclude substantial evidence supports defendant's conviction as an aider and abettor for discharging a firearm from a motor vehicle.

DISPOSITION

The judgment is affirmed.

HOCH , J.

We concur:

RAYE , P. J.

MURRAY , J.

10